## Case No. 4,815.

### FISHER v. CARTER.

[1 Wall. Jr. 69.] [1]

Circuit Court, E. D. Pennsylvania. Nov. 8, 1843.

[1] [Reported by John William Wallace, Esq.]

Mr. J. Fisher, of Lewiston, and Mr. Randall for plaintiff:

After full argument on the other side, by Mr. M'Cormick, of Harrisburgh, and Mr. Mallery, the charge of the court was delivered by

BALDWIN, Circuit Justice. The case of Carson v. Blazer [supra] goes far to decide by implication the one before us. It was there declared that the founder of our state, from motives of an enlarged publick policy, had reserved to himself the ownership of all the larger streams of the commonwealth;— the riparian owner coming but to low water mark. The· river includes what is in the river, whether above the water or under it. And it is obvious that if any man might, at his pleasure, have taken possession of all the islands in a stream, he would have had it quite within his power to impede what we are told was the wise design of the proprietary owner. But we can scarcely regard the point as one which has been decided. Let it be examined, then, upon the grounds of historical evidence. Thorough research has been made into the early records of the land-office; and the fidelity of counsel has presented to us every thing, probably, which can be gleaned from that field of inquiry. The evidence from those records is not, we may admit, of the most direct kind. It is not wholly irreconcilable with the notion that islands were open to settlement in 1749: but this is not the natural inference from it. On the contrary: though all islands were particularly taken into possession by the great warrant of 13th October, 1760, and were thenceforth the subjects of peculiar and notorious regard, yet we do not discern any striking change in any matter connected with the disposal of them. Nay, so far as we can compare the history of that sort of property before and after the 13th October, 1760, we find that the general policy in regard to it has been always the same. Then, there is this remarkable fact: that diligent search into all these records does not afford one precedent of an island granted upon common terms, though it does furnish to us many grants of islands. Admit that what is thus stated is, in each instance, but negative evidence. The circumstance impairs not its strength; for the case is one where, under any hypothesis contrary to that which we assume, there could scarcely fail to be positive evidence: and in such a case negative evidence is as strong as any that can be conceived. In truth, it is negative in form merely, not in effect.

In the third place, we have evidence in the external order or disposition of the papers relating to islands. This sort of evidence, the evidence of acts and monuments, is justly deemed of a high order. Any mere assertion that such and such opinions were held, or that such and such facts existed, depends for its credibility upon a variety of circumstances. But an external fact, a

course of outward action, performed in observance of an opinion or practice, and testifying to it, indicates a clearness and fixity of idea which can leave but little doubt of its existence. It would, to be sure, be more satisfactory could the defendant shew, affirmatively, that this disposition of things had existed from the beginning; for this would be nearly conclusive. But the presumption from the state of the papers at the earliest date to which we can reach is in his favour. They were found in their present position by the deputy secretary of the land office when he first came into the department; and no effort of the plaintiff's counsel has shewn when any change was made, or that there was, ever, a time when a different state of things from the present existed. Certainly we do know that a course of external practice no where more generally descends than in large state offices. The clerk, on his coming there, finds a practice prevailing: he is trained up in it: he follows it in his gradations upward; and when he is old he will not depart from it. Super-added to all this, are declarations from eminent lawyers of a past day, which accord with what has been already mentioned; and serve both to explain and to confirm it. To be sure, this court is not disposed to regard with favour what an English reporter styles "circuit traditions;" but we are now inquiring what state of facts existed three generations ago; a date beyond that to which the law supposes human memory ever to reach. We are without living witnesses; and in this as in other questions relating to ancient things, what can we do but call to our aid the less perfect lights of tradition? In examining any ancient historical fact, if unable to procure testimony from persons who lived at the very epoch which is the subject of our inquiry, we endeavour to ascertain what has been said by intelligent persons living in the generation immediately or almost next. Such persons, we may grant, are liable to errour; but they are less so than any persons living in a subsequent generation: And we appeal to their declarations, not, of course, as to decisions, from which there can be no appeal, but as to credible witnesses, likely to be informed on the subjects about which they speak. The counsel of the plaintiff has argued against this sort of evidence from the imperfection of the channels through which it comes to us. There would be force in such an argument were the distance great or the links of transmission numerous; but where, as in this case, the witness is separated from the time about which he speaks, only by a single generation, the channel is so short and close that truth may be supposed to reach us in almost the same purity wherewith it issued from the wellhead. It is worth observing too, that the testimony here given is, not as to an opinion, but as to a fact. In regard to the former, it is certainly true, as the plaintiff's counsel argues, that a witness transmits what he understood, or what he remembers, or what he conceives; and there may be great adulteration of truth while its outward shape and seeming is preserved; but the simplicity of notion involved in the existence or non-existence of a fact, admits scarce any variations from truth but in the substitution of another and opposite fact; a matter not to be presumed. The declarations of the late Chief Justice Tilghman the court regards as entitled to particular respect. It has been the just praise of that excellent magistrate that he delivered few dicta; and his statement of any fact (much more of one about which he was so likely, from associations in youth, to be informed) will receive from those who knew him high deference, even though the source of his information be not specially declared. Let it moreover be observed that the chief justice speaks, not only of what he himself thought, but also of that which had been universal opinion—and practice. Indeed, for much of our law we are unable to shew any visible and now existing source. It is tradition attested by monuments; successive judges and sages of the law recording what themselves were taught; was attested by external facts, and was notorious to every one: all consentient in opinion, and so transmitting to the last that which was more perfectly known to the first. We do know, however, that many matters have been solemnly adjudged, of which there is no report; and many statutes have been passed of which there remains not now a record. These remarks apply particularly to the land tenures of Pennsylvania; in regard to which many principles are perfectly settled and have long been, touching whose origin it would probably pass research to discover so much as a dictum.

Upon the whole, while the case does not offer the directest, most connected, and most conclusive testimony that could be desired, we yet possess strong leading facts on which to found opinion; and in regard to things which took place ninety-three years ago, what more ought you to expect? Landmarks remain to us: the connecting links, the cement, the filling up, may naturally have crumbled away in the lapse of a century. And it having passed into maxim, that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted, we are of opinion that your verdict should be for the defendant.

The jury were about to give their verdict, when the plaintiff asked leave and was allowed to suffer a non-suit.